## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MINNESOTA

| | |
|---|---|
| DANIEL RICO, individually and as a representative of a class of similarly situated persons, and on behalf of the RBC U.S.A. RETIREMENT AND SAVINGS PLAN,<br><br>        *Plaintiff*,<br><br>vs.<br><br>RBC USA HOLDCO CORPORATION, THE BOARD OF DIRECTORS OF RBC USA HOLDCO CORPORATION AND ITS MEMBERS, THE RBC USA PENSIONS AND BENEFITS COMMITTEE AND ITS MEMBERS, DOES 1-20, and DOES 21-40,<br><br>        *Defendants*. | Civil File No. 0:26-cv-02008-PJS-ECW |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................. 4

    A.    The Plan.................................................................................................................. 4

        1.    The Mid-Cap Fund ............................................................................ 5

        2.    The Growth Stock Fund .................................................................... 9

    B.    The Complaint...................................................................................................... 14

LEGAL STANDARD......................................................................................................... 15

ARGUMENT ..................................................................................................................... 16

I.    RICO LACKS ARTICLE III STANDING TO ASSERT CLAIMS RELATING TO THE MID-CAP FUND ................................................................. 16

II.    RICO FAILS TO PLAUSIBLY ALLEGE THAT IT WAS IMPRUDENT TO CONTINUE OFFERING THE CHALLENGED FUNDS. ............................ 19

    A.    Rico's Allegations that the Challenged Funds Underperformed Other Funds Are Insufficient to Survive a Motion to Dismiss.................... 19

    B.    Rico Fails to Offer Meaningful Comparators to the Challenged Funds .................................................................................................................... 21

        1.    Market Indexes and Passively-Managed Index Funds Are Not Meaningful Comparators. .......................................................... 21

        2.    The Actively-Managed Comparators Are Not "Meaningful Benchmarks." ................................................................................. 22

            a.    The Mid-Cap Fund.................................................................. 23

            b.    The Growth Stock Fund ......................................................... 25

    C.    Rico Has Not Alleged that the Challenged Funds Systematically and Materially Underperformed His Proposed Comparators...................... 27

III.    RICO'S CO-FIDUCIARY AND DUTY-TO-MONITOR CLAIMS SHOULD BE DISMISSED ................................................................................... 31

IV.    RICO FAILS TO PLAUSIBLY ALLEGE THAT RBC AND THE BOARD ARE FIDUCIARIES WITH CONTROL OVER PLAN INVESTMENTS. .......................................................................... 32

CONCLUSION .................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allen v. Wells Fargo & Co.*,
967 F.3d 767 (8th Cir. 2020) ...................................................................... 31

*Anderson v. Intel Corp. Inv. Pol'y Comm.*,
137 F.4th 1015 (9th Cir. 2025) ................................................................... 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................. 15, 19

*Batt v. 3M Co.*,
2026 WL 674322 (D. Minn. Mar. 10, 2026) ........................................... 4, 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................. 32

*Bracalente v. Cisco Sys., Inc.*,
2025 WL 770350 (N.D. Cal. Mar. 11, 2025) .............................................. 25

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) .............................................................. 18, 19

*Breaker v. United States*,
977 F. Supp. 2d 921 (D. Minn. 2013) ........................................................ 15

*Brown v. Medtronic, Inc.*,
628 F.3d 451 (8th Cir. 2010) ..................................................................... 17

*Brown-Davis v. Walgreen Co.*,
2020 WL 8921399 (N.D. Ill. Mar. 16, 2020) .............................................. 17

*Cervantes v. Invesco Holding Co. (US), Inc.*,
2019 WL 5067202 (N.D. Ga. Sept. 25, 2019) ............................................ 29

*Collins v. Ne. Grocery, Inc.*,
149 F.4th 163 (2d Cir. 2025) ..................................................................... 17

*Crocker v. KV Pharm. Co.*,
782 F. Supp. 2d 760 (E.D. Mo. 2010) ........................................................ 32

iii

*Davis v. Salesforce.com, Inc.*,
2020 WL 5893405 (N.D. Cal. Oct. 5, 2020)...............................................................22

*Davis v. Wash. Univ. in St. Louis*,
960 F.3d 478 (8th Cir. 2020) ...........................................................................*passim*

*Dawson v. Brookfield Asset Mgmt. LLC*,
2026 WL 835553 (N.D. Ohio Mar. 26, 2026) .........................................................29-30

*Divane v. Nw. Univ.*,
953 F.3d 980 (7th Cir. 2020) ................................................................................. 19

*Enstrom v. SAS Inst.*,
2025 WL 685219 (E.D.N.C. Mar. 3, 2025) ............................................................... 17

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014)............................................................................................. 16

*Forman v. TriHealth, Inc.*,
40 F.4th 443 (6th Cir. 2022) .......................................................................... 20, 28

*Forman v. TriHealth, Inc.*,
563 F. Supp. 3d 753 (S.D. Ohio 2021) .................................................................27-28

*Fritton v. Taylor Corp.*,
2022 WL 17584416 (D. Minn. Dec. 12, 2022)........................................................16-17

*Hughes v. Nw. Univ.*,
595 U.S. 170 (2022)............................................................................................. 20

*Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP Fund*,
513 F. App'x 78 (2d Cir. 2013) ............................................................................. 27

*Maniace v. Com. Bank of Kan. City, N.A.*,
40 F.3d 264 (8th Cir. 1994) .................................................................................. 32

*Matney v. Barrick Gold of N. Am.*,
80 F.4th 1136 (10th Cir. 2023) ............................................................................. 23

*Matousek v. MidAmerican Energy Co.*,
51 F.4th 274 (8th Cir. 2022) ...........................................................................*passim*

*Meiners v. Wells Fargo & Co.*,
898 F.3d 820 (8th Cir. 2018) ..........................................................................*passim*

iv

*Navarro v. Wells Fargo & Co.*,
  2025 WL 897717 (D. Minn. Mar. 24, 2025) ................................................. 4

*Osborn v. United States*,
  918 F.2d 724 (8th Cir. 1990) ...................................................................... 15

*Parmer v. Land O'Lakes, Inc.*,
  518 F. Supp. 3d 1293 (D. Minn. 2021) .............................................. 21-22, 26

*Patterson v. Morgan Stanley*,
  2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ............................................ 29, 30

*Pegram v. Herdich*,
  530 U.S. 211 (2000) .................................................................................. 33

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013) ......................................................... 16, 19-20, 21

*Schave v. CentraCare Health Sys.*,
  2023 WL 1071606 (D. Minn. Jan. 27, 2023) ......................................... 18, 27

*Smith v. CommonSpirit Health*,
  2021 WL 4097052 (E.D. Ky. Sept. 8, 2021) ................................................ 29

*Smith v. CommonSpirit Health*,
  37 F.4th 1160 (6th Cir. 2022) ......................................................... *passim*

*Thole v. U.S. Bank N.A.*,
  590 U.S. 538 (2020) ............................................................................. 16, 17

*Town of Chester v. Laroe Ests., Inc.*,
  581 U.S. 433 (2017) .................................................................................. 16

*White v. Chevron Corp.*,
  2016 WL 4502808 (N.D. Cal. Aug. 29, 2016), *aff'd*, 752 F. App'x 453
  (9th Cir. 2018) ......................................................................................... 21

*Wilcox v. Georgetown Univ.*,
  2019 WL 132281 (D.D.C. Jan. 8, 2019) ...................................................... 17

*Wildman v. Am. Century Servs., LLC*,
  362 F. Supp. 3d 685 (W.D. Mo. 2019) ..................................................... 5, 7

*Williams v. Centene Corp.*,
  2023 WL 2755544 (E.D. Mo. Mar. 31, 2023) ............................................. 27

v

*York v. Wellmark, Inc.*,
  2017 WL 11261026 (S.D. Iowa Sept. 6, 2017) ..........................................................32

**STATUTES**

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) ..............................................................32-33

ERISA § 405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3)......................................................... 31

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(1) ..................................................................................... 1, 15

Fed. R. Civ. P. 12(b)(6) ................................................................................. 1, 15, 16

Defendants RBC USA Holdco Corporation ("RBC"), the Board of Directors of RBC USA Holdco Corporation and Its Members ("Board"), and the RBC USA Pensions and Benefits Committee and Its Members ("Committee") respectfully submit this memorandum of law in support of their motion to dismiss the Complaint (ECF No. 1, the "Compl.") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## PRELIMINARY STATEMENT

RBC offers its employees a generous retirement savings program, the RBC U.S.A. Retirement and Savings Plan (the "Plan"). The Plan is a 401(k) individual account plan through which participants may contribute a portion of their earnings and receive a dollar-for-dollar employer match on the first 6% of eligible pay.

Like hundreds of other cases filed in this District and nationwide, this putative class action commenced by former Plan participant Daniel Rico alleges violations of the Employee Retirement Income Security Act of 1974 ("ERISA") based on the supposed underperformance of certain Plan investments. Rico specifically takes aim at two well-known investment funds included in the Plan's diversified investment lineup: the T. Rowe Price Mid-Cap Growth Fund ("Mid-Cap Fund") and the T. Rowe Price Growth Stock Fund ("Growth Stock Fund") (collectively, the "Challenged Funds"). His theory is simple—and fatally flawed: Rico contends that because the Challenged Funds underperformed a handful of other investment funds, the Court should infer that Defendants breached their duty of prudence by not removing them from the Plan and greenlight costly class-action discovery. But hindsight-driven allegations of underperformance do not state a plausible claim for relief. The Eighth Circuit has issued a

trilogy of opinions establishing the pleading standard for breach-of-fiduciary-duty claims like this one, and Rico's Complaint falls woefully short of that standard.

The Complaint should be dismissed for several reasons. As a threshold matter, Rico lacks Article III standing to assert claims related to the Mid-Cap Fund because he never invested in that fund. He therefore could not have suffered any injury from the Mid-Cap Fund's inclusion in the Plan, and a ruling that Defendants breached their fiduciary duty by maintaining the Mid-Cap Fund would not benefit Rico.

The Complaint also fails to state a plausible claim for relief. Rico's theory is that, because the Challenged Funds allegedly underperformed other funds during certain cherry-picked timeframes, it was imprudent for Defendants to retain them. But the law is clear that "the choice of a particular fund is not flawed merely because of the existence of one fund that ended up performing better." *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 n.3 (8th Cir. 2018). In other words, allegations of underperformance alone do not state an imprudence claim.

Instead, to survive a motion to dismiss, a plaintiff must allege that a challenged fund consistently and appreciably underperformed "a meaningful benchmark." *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 280 (8th Cir. 2022). Rico does not allege any meaningful benchmark, however. For each Challenged Fund, he cites one index and one passively-managed fund designed to replicate that index. But unlike the Challenged Funds, the indexes are unmanaged and not available for investment, and index funds are fundamentally different investment vehicles with different aims, risk profiles, and return characteristics. *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 484 (8th Cir.

2020). Similarly, the actively-managed funds he identifies employ different investment strategies and entail different risks than the Challenged Funds.

What's more, Rico does not allege that the Challenged Funds experienced the type of sustained, material underperformance that could support an inference of imprudence. Rico alleges that over the five years leading up to the putative class period, the cumulative performance of the Challenged Funds was inferior to that of a few other available funds. But the Challenged Funds *outperformed* the alleged comparators over other timeframes, including during the putative class period. For example, in the first year of the putative class period, the Mid-Cap Fund outperformed two of Rico's five comparators; the next year, it outperformed four of five; and this year, it outperformed them all. Plan participants have thus been *better off* for much of the putative class period because the Committee chose to keep the Mid-Cap Fund in the Plan rather than switching to one of Rico's comparator funds. A similar story can be told about the Growth Stock Fund, which outperformed all but one of Rico's comparators during the third year of the putative class period. Courts have universally rejected complaints like Rico's that attempt to manufacture an imprudence claim by focusing on a single snapshot in time.

Because the Complaint does not plausibly allege that Defendants acted imprudently, Rico's derivative claims for co-fiduciary breach and breach of the duty to monitor necessarily fail as well. Rico has failed to adequately plead those derivative claims in any event.

In short, the Complaint should be dismissed in its entirety without leave to replead.

## BACKGROUND

The facts set forth in this brief are based on the Complaint and documents expressly referenced or "embraced" by the Complaint. *Meiners*, 898 F.3d at 822. When a complaint alleges that a fiduciary breached a duty by retaining a particular investment fund in a plan, documents embraced by the pleadings include the plan document and publicly-available disclosures and performance data regarding those investments. *See Matousek*, 51 F.4th at 279 (Form 5500s); *Davis*, 960 F.3d at 484 n.3 (prospectuses); *Batt v. 3M Co.*, 2026 WL 674322, at *4 n.2 (D. Minn. Mar. 10, 2026) (Tostrud, J.) (fund fact sheets); *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1168 (6th Cir. 2022) (performance data); *Navarro v. Wells Fargo & Co.*, 2025 WL 897717, at *4 n.8 (D. Minn. Mar. 24, 2025) (Provinzino, J.) (plan document).

### A.    The Plan

The Plan is a participant-directed, individual retirement account plan that offers a diversified menu of investment funds in which participants may invest their retirement savings. (Compl. ¶¶ 39-40.) Participants may invest their account in any one or more of dozens of available investment funds, including various mutual funds available through the Plan's brokerage window. (Declaration of Sherena Jeske ("Jeske Decl.") Ex. A (Form 5500) at 7, 13.) The Committee is responsible for selecting and monitoring the Plan's investment funds; neither RBC nor the Board have any responsibilities related to the Plan's investments. (Jeske Decl. Ex. B (Plan Document) § 15.2.)

The Complaint targets only two funds: (1) the Mid-Cap Fund, and (2) the Growth Stock Fund.

4

### 1.   *The Mid-Cap Fund*

The Mid-Cap Fund is actively managed by T. Rowe Price and has been available for investment by Plan participants since 2009. (Compl. ¶ 8.) It "seeks to provide long-term capital appreciation by investing in mid-cap stocks with potential for above-average earnings growth." (Declaration of Neil V. Shah ("Shah Decl.") Ex. A (Fact Sheet) at 1.)[1] T. Rowe Price pursues that goal by employing a "fundamentally-driven" investment approach, i.e., it seeks to identify and invest in companies that have "successfully weathered the 'start-up years'; offer proven products and/or services; have experienced management teams; can finance their own growth; [and are] considered 'rapid' growers." (*Id.*) (cleaned up).[2]

T. Rowe Price benchmarks the Mid-Cap Fund's performance to the Russell Midcap Growth Index. (Shah Decl. Ex. A at 1.) That index is unmanaged and not available for investment; it is a market index of U.S. companies that the Financial Times Stock Exchange ("FTSE") designates as mid-cap growth companies. (Compl. ¶ 11 n.1; Shah Decl. Ex. B (Fact Sheet).) T. Rowe Price discloses to investors that the Mid-Cap

---

[1] The fact sheets for the Challenged Funds and Rico's comparators are the versions that were available on each fund manager's website on or about the date the Complaint was filed. The web address for each fund, where the current fact sheet is posted, is identified in the accompanying Shah Declaration.

[2] *See Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 706 n.12 (W.D. Mo. 2019) ("[Fundamentally-driven investing] uses qualitative and quantitative information of a company's financial and economic position to determine whether a security is overvalued or undervalued.").

Fund's "growth approach to investing could cause it to underperform other [mid-cap] stock funds that employ a different investment style." (Shah Decl. Ex. A at 1.)

The Mid-Cap Fund holds approximately $25 billion in 131 mid-cap companies. (*Id.* Ex. C (Certified Shareholder Report) at 3.) The fund's top-ten investments comprise only 18.6% of its holdings, and its largest investments are in the healthcare and information technology sectors. (*Id.* Ex. A at 3.) In the five years prior to the putative class period (2016 to 2020), the Mid-Cap Fund held $128 million in Plan assets, earned annual returns of 16.38%, and earned cumulative returns exceeding 113%. (Compl. ¶¶ 189-90, Table 2.a.)

Rico compares the performance of the Mid-Cap Fund to the Russell Midcap Growth Index; one passively-managed fund tracking that index—the Fidelity Mid Cap Growth Index Fund; and three actively-managed funds—the Baron Focused Growth Fund ("Baron Fund"), the Federated Hermes MDT Mid Cap Growth Fund ("Federated Fund"), and the Janus Henderson VIT Enterprise Fund ("Janus Henderson Fund"). (Compl. at Table 2.a.) He generally alleges that the actively-managed funds are all "mid cap growth" funds (Compl. ¶¶ 120, 128, 139, 148), but he does not allege any facts about their investment strategies or otherwise demonstrate that they are meaningful benchmarks to the Mid-Cap Fund. To the contrary, the proposed comparators are materially different from the Mid-Cap Fund—they are a fraction of its size, have different aims and investment strategies, and invest in different sectors and companies.

The **Baron Fund** invests approximately $3.42 billion in 28 companies, concentrating over 60% of its investments in just 10 companies. (Shah Decl. Ex. D (Fact

6

Sheet) at 1.) While the Mid-Cap Fund invests only in mid-cap companies, the Baron Fund invests in both small and mid-sized companies that entail greater risks. (*Id.* Ex. E at 5 (Summary Prospectus).) Its largest investments are in the aerospace and defense and automotive sectors. (*Id.* Ex. D at 1.) Unlike the Mid-Cap Fund, which is benchmarked to the Russell Midcap Growth Index, the Baron Fund is benchmarked to the Russell 2500 Growth Index and the Russell 3000 Index. (*Id.*) The Baron Fund and the Mid-Cap Fund also do not share in common any of their top-ten investments. (*Compare id. with id.* Ex. A at 2.)

The **Federated Fund** invests approximately $5.6 billion in 124 growth-oriented mid-cap companies, concentrating more than a quarter of its investments in 10 companies. (*Id.* Ex. F (Fact Sheet) at 1.) Unlike the fundamentally-driven approach of the Mid-Cap Fund, the Federated Fund identifies companies for investment "through a bottom up, quantitatively-driven process" that seeks to "remove subjective and emotional influences from security selection." (*Id.*)[3] The fund's largest investments are in the consumer discretionary and industrial sectors. (*Id.* at 1.) The Federated Fund and the Mid-Cap Fund share in common only one of their top-ten investments. (*Compare id. with id.* Ex. A at 2.)

---

[3] *See Davis*, 960 F.3d at 487 n.3 (quantitative modeling uses mathematical models and computer programs to exceed market returns); *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 712 n.12 (W.D. Mo. 2019) (quantitatively-driven investing "relies on mathematical and statistical measures to value a security").

The **Janus Henderson Fund** is one-thirteenth the size of the Mid-Cap Fund. (*Id.* Ex. G (Fact Sheet) at 1.) It invests $1.84 billion in 77 mid-cap companies and concentrates more than a quarter of its investments in just 10 companies. (*Id.* at 1-2.) The fund "[a]ims for less risk than the majority of peers and the index." (*Id.* at 1.) Its largest investments are in the industrial and information technology sectors. (*Id.* at 2.) The Janus Henderson Fund and the Mid-Cap Fund do not share in common any of their top-ten investments. (*Compare id. with id.* Ex. A at 2.)

The differences between the Mid-Cap Fund and Rico's proposed actively-managed comparator funds are summarized in the table below, with the shaded boxes indicating significant differences.

| | Mid-Cap | Baron Fund | Federated Fund | Janus Henderson Fund |
|---|---|---|---|---|
| **Benchmark** | Russell Midcap Growth | Russell 2500 Growth Russell 3000 Index | Russell Midcap Growth | Russell Midcap Growth |
| **Investment Approach** | Fundamentally-driven | Concentrated Long-term investment | Quantitatively-driven | Low-risk |
| **Assets** | $25 billion | $3.42 billion | $5.6 billion | $1.84 billion |
| **Holdings** | 131 | 28 | 124 | 77 |
| **Types of Companies** | Mid-cap | Small and mid-cap | Growth-oriented mid-cap | Mid-cap |
| **Top-10 Concentration** | 18.60% | 60% | 26.5% | 28.02% |
| **Top-2 Sectors** | Healthcare Information Technology | Aerospace & Defense Auto Manufacturing | Consumer Discretionary Industrials | Industrials Information Technology |

Although the Complaint focuses only on the cumulative performance of these funds between 2016 and 2021, the chart below shows that, on an annual basis, the Mid-

8

Cap Fund has often outperformed Rico's proposed comparators since 2009, when the Mid-Cap Fund was added to the Plan.[4]

**Annual Performance for the Mid-Cap Fund and Alleged Comparator Funds**

Legend:
- Mid-Cap Fund
- Russell Midcap Growth Index
- Federated Fund
- Janus Henderson Fund
- Baron Fund (2017 to present)
- Fidelity Mid Cap Growth Index Fund (2020 to present)

### 2. The Growth Stock Fund

The Growth Stock Fund is actively managed by T. Rowe Price and was first added to the Plan in 2013. (Compl. ¶ 8.) It follows a fundamentally-driven investment approach to identify companies "having one or more of the following characteristics: strong growth in earnings and cash flow; ability to sustain earnings momentum even during economic

---

[4] Annual returns are based on the adjusted opening and closing prices reported on Yahoo Finance, https://finance.yahoo.com. The chart does not contain the annual returns for: (i) the Baron Fund prior to 2017 because the share class Rico identifies in the Complaint (Compl. at Table 2.a) was formed in mid-2016 (Shah Decl. Ex. E at 7), and (ii) the Fidelity Mid Cap Growth Index Fund prior to 2020 because that passively-managed index fund was formed in mid-2019 (Compl. at 40 n.5).

9

slowdowns; [and] occupation of a lucrative niche in the economy and ability to expand even during times of slow economic growth." (Shah Decl. Ex. H (Fact Sheet) at 1.) The fund is benchmarked to the Russell 1000 Growth Index (*id.*), which is an unmanaged index and not available for investment; it is a market index of U.S. companies that FTSE designates as large-cap growth companies (Compl. ¶ 12 n.2; Shah Decl. Ex. I). T. Rowe Price discloses to investors that the "fund's growth approach to investing could cause it to underperform other stock funds that employ a different investment style." (Shah Decl. Ex. H at 1.)

The Growth Stock Fund invests approximately $50 billion in 99 well-established growth companies. (*Id.* Ex. J (Certified Shareholder Report) at 4.) Its top-ten holdings comprise almost 66% of the fund's investments. (*Id.* Ex. H at 2.) Investments are concentrated in the information technology and communications sectors. (*Id.*) In the five years prior to the alleged class period (2016 to 2020), the Growth Stock Fund held $293 million in Plan assets and yielded annual returns of 19.34% and cumulative returns exceeding 142%. (Compl. ¶ 176, Table 1.a.)

The Complaint compares the Growth Stock Fund to the Russell 1000 Growth Index; one passively-managed index fund—the Vanguard Russell 1000 Growth Index Fund; and three actively-managed funds—the Alger Focus Equity Fund ("Alger Fund"), the Federated Hermes MDT Large Cap Growth Fund ("Federated Large Cap Fund"), and the Fidelity Blue Chip Growth Fund ("Fidelity Fund"). (Compl. at Table 1.a.) He alleges that the actively-managed funds are "large cap" growth funds that share three common holdings with the Growth Stock Fund. (*Id.* ¶¶ 71, 79, 89, 99.) Other than those superficial

10

similarities, he does not allege any facts about their investment strategies or otherwise demonstrate that they are meaningfully comparable to the Growth Stock Fund. On the contrary, the other funds are different in size and have different aims, strategies, and investments as compared to the Growth Stock Fund.

The **Alger Fund** invests approximately $4.53 billion in 50 companies of various market capitalizations. (Shah Decl. Ex. K (Certified Shareholder Report) at 18.) The fund distinguishes itself from other growth funds by deploying a proprietary investment strategy called "Positive Dynamic Change" that its manager pioneered sixty years ago. (*Id.* Ex. L (Fact Sheet) at 1.) That strategy involves identifying companies with two distinct qualities: (*i*) "High Unit Volume Growth," which means growing revenues and unit volume, increasing market share, and business expansion, and (*ii*) "Positive Life Cycle Change," which is where a catalyst (e.g., new management, product innovation) drives a "growth renaissance." (*Id.*) The manager follows a five-step process to construct and monitor portfolios using its Positive Dynamic Change strategy. (*Id.*) The Alger Fund's top holdings are in the information technology and communications sectors, and its top-ten holdings make up 62.53% of its investments. (*Id.* at 3.)

The **Federated Large Cap Fund** is less than one-eleventh the size of the Growth Stock Fund. (*Id.* Ex. M (Fact Sheet) at 1.) It invests approximately $4.4 billion in 97 large-cap domestic companies. (*Id.*) Unlike the fundamentally-driven approach of the Growth Stock Fund, the Federated Large Cap Fund identifies companies for investment "through a bottom up, quantitatively-driven process" that seeks to "remove subjective and emotional influences from security selection." (*Id.*) Its largest investments are in the

11

information technology and consumer discretionary sectors, and its top-ten holdings make up 45.8% of the fund's investments (as compared to the Growth Stock Fund's 65.9%). (*Compare id. with id.* Ex. H at 2.)

The **Fidelity Fund** invests approximately $82.67 billion in 375 companies. (*Id.* Ex. N (Fact Sheet) at 1.) Unlike the fundamentally-driven approach of the Growth Stock Fund, the Fidelity Fund employs a quantitative analysis that considers each company's financial condition, industry position, and other fundamental factors. (*Id.*) The fund invests overwhelmingly in domestic and foreign "blue chip" companies, which are companies that are well-established and well-capitalized and have a higher market capitalization than the smallest companies in the S&P 500, Russell 1000, and Dow Jones Industrial indexes. (*Id.*) The Fidelity Fund's largest investments are in the information technology and consumer discretionary sectors, and its top-ten holdings make up 60.45% of its investments. (*Id.*) Nearly 85% of its investments are in just 50 companies. (*Id.*)

The differences between the Growth Stock Fund and Rico's actively-managed comparator funds are summarized in the table below, with the shaded boxes indicating significant differences.

12

|  | Growth Stock Fund | Alger Fund | Federated Large Cap Fund | Fidelity Fund |
|---|---|---|---|---|
| **Investment Approach** | Fundamentally-driven | In-house "Positive Dynamic Change" | Quantitatively-driven | Quantitatively-driven |
| **Assets** | $50 billion | $4.53 billion | $4.4 billion | $82.67 billion |
| **Holdings** | 99 | 50 | 97 | 375 |
| **Types of Companies** | Well-established growth companies | Companies of any capitalization | Growth stocks of large-cap domestic companies | Domestic and foreign "blue chip" companies |
| **Top-10 Concentration** | 65.9% | 62.53% | 45.80% | 60.45% |
| **Top-2 Sectors** | Information Technology Communications | Information Technology Communications | Information Technology Consumer discretionary | Information Technology Consumer discretionary |

The chart below summarizes the annual performance of the Growth Stock Fund and Rico's comparator funds since 2013, when the Growth Stock Fund was added to the Plan.[5] As the chart shows, the Growth Stock Fund performed as well or better than the proposed comparators during certain years.

---

[5] Annual returns are based on the adjusted opening and closing prices reported on the Yahoo Finance website, https://finance.yahoo.com. The chart does not contain the annual returns for the Alger Fund prior to 2018 and the Federated Large Cap Fund prior to 2025 because the share classes identified in the Complaint (Compl. at Tables 1.a-b) for those funds were formed in 2017 and 2024, respectively (Shah Decl. Ex. L at 2; Ex. M at 2).



**Annual Performance for the Growth Stock Fund and Alleged Comparator Funds**

Legend:
- Growth Stock Fund
- Russell 1000 Growth Index
- Vanguard Russell 1000 Growth Index Fund
- Fidelity Fund
- Alger Fund (2018 to present)
- Federated Large Cap Fund (2025 to present)

### B.    The Complaint

Plaintiff Daniel Rico was a participant in the Plan who invested in the Growth Stock Fund, but not the Mid-Cap Fund. (Compl. ¶¶ 24, 31-32.) He alleges that, as measured over the five-year period between January 1, 2016 and December 31, 2020: (*i*) the Mid-Cap Fund underperformed the Russell Midcap Growth Index and the three actively-managed funds discussed above; and (*ii*) the Growth Stock Fund underperformed the Russell 1000 Growth Index, a passively-managed fund tracking the index, and the three actively-managed funds discussed above. (*Id.* ¶¶ 174-77, 188-90.) Rico alleges that, based on the Challenged Funds' five-year cumulative performance, Defendants should have removed them from the Plan by January 1, 2021, and replaced them with alternatives. (*Id.*) Rico further alleges that the Challenged Funds

14

underperformed the indexes and his comparators during certain stretches of the putative class period. (*Id.* ¶¶ 171-80, 191.)

Rico asserts two causes of action. In *Count I*, he alleges that the Committee breached its fiduciary duty of prudence by maintaining the Challenged Funds in the Plan's investment lineup, and that the other Defendants knowingly participated in those breaches. (*Id.* ¶¶ 211-17.) In *Count II*, he alleges that Defendants breached their fiduciary duty to monitor. (*Id.* ¶¶ 219-23.) Rico purports to bring his claims on behalf of all Plan participants who invested in the Challenged Funds since January 1, 2021. (*Id.* ¶ 201.)

## LEGAL STANDARD

A court may dismiss a claim under Federal Rule of Civil Procedure 12(b)(1) for "lack of subject-matter jurisdiction." A district court lacks subject-matter jurisdiction if a plaintiff lacks standing. *Breaker v. United States*, 977 F. Supp. 2d 921, 931 (D. Minn. 2013) (Nelson, J.). When deciding a motion under Rule 12(b)(1), courts "must distinguish between a facial attack and a factual attack." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). Here, Defendants raise a facial attack by arguing that— even assuming the truth of the allegations in the Complaint—Rico does not have Article III standing to pursue claims related to the Mid-Cap Fund.

A court may dismiss a claim under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." To withstand dismissal under Rule 12(b)(6), a plaintiff must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In other words, the complaint must allege facts establishing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A plan participant armed only with

15

conjecture should not be permitted to expose fiduciaries to costly discovery in an attempt to extract a settlement of baseless claims. *See Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc. ("PBGC")*, 712 F.3d 705, 719 (2d Cir. 2013); *Meiners*, 898 F.3d at 822. The Supreme Court has explained that a motion to dismiss under Rule 12(b)(6) is an "important mechanism for weeding out meritless [ERISA] claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

## ARGUMENT

I. **RICO LACKS ARTICLE III STANDING TO ASSERT CLAIMS RELATING TO THE MID-CAP FUND.**

The Court should dismiss all claims to the extent they relate to the Mid-Cap Fund because Rico never invested in that fund and therefore does not have Article III standing to pursue those claims. "To establish standing under Article III of the Constitution, a plaintiff must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020). "[S]tanding is not dispensed in gross," and "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). "There is no ERISA exception to Article III." *Thole*, 590 U.S. at 547.

A plaintiff like Rico lacks Article III standing to challenge the selection of a 401(k) plan investment fund in which he never invested because the selection could not have caused him any injury. *See Fritton v. Taylor Corp.*, 2022 WL 17584416, at *8 (D.

16

Minn. Dec. 12, 2022) (Tostrud, J.) ("Without at least a basic allegation that one or more Plaintiffs invested in one or more funds that are the subject of this claim, Plaintiffs cannot show that any of them suffered injury resulting from the alleged fiduciary breaches this theory challenges."); *Collins v. Ne. Grocery, Inc.*, 149 F.4th 163, 172-74 (2d Cir. 2025) (plaintiffs lacked standing to challenge three of twenty-eight plan investments in which they did not invest); *see also Brown v. Medtronic, Inc.*, 628 F.3d 451, 454 (8th Cir. 2010) (holding that participant in employee stock ownership plan lacks standing to assert fiduciary breach claim where he suffered no loss from his purchase and sale of company stock as a result of the alleged breach).[6]

Here, Rico does not allege that he invested in the Mid-Cap Fund. (Compl. ¶¶ 24, 31-32.) He therefore could not have suffered any injury due to the Plan's inclusion of the Mid-Cap Fund. Nor would any ruling with respect to the Mid-Cap Fund grant Rico any relief. Absent an allegation that he invested in the Mid-Cap Fund, a hypothetical judgment that Defendants acted imprudently by retaining the fund would do nothing for him. Such a judgment "would benefit only those Plan participants who invested in [the Mid-Cap Fund] and paid [its] fees." *Fritton*, 2022 WL 17584416, at *8; *see Brown*, 628 F.3d at 457. Because Rico is not among those participants, a favorable judgment would leave him no better off than a loss—which is the hallmark of a nonjusticiable claim. *See Thole*, 590 U.S. at 541 (holding that participants lacked standing because "were [they]

---

[6] *See also Enstrom v. SAS Inst.*, 2025 WL 685219, at *6-7 (E.D.N.C. Mar. 3, 2025); *Brown-Davis v. Walgreen Co.*, 2020 WL 8921399, at *3 (N.D. Ill. Mar. 16, 2020); *Wilcox v. Georgetown Univ.*, 2019 WL 132281, at *8-9 (D.D.C. Jan. 8, 2019).

to lose this lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny less").

To be sure, some courts have relied on *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009), to conclude that a participant has standing to pursue a fiduciary-breach claim related to a fund in which he did not invest.[7] But *Braden* actually compels the opposite conclusion. The plaintiff in *Braden* alleged injury to his plan account arising from fiduciary breaches that affected the full menu of plan investment options, including those in which he personally invested. *Id.* at 590-91. The Eighth Circuit found standing because the plaintiff alleged "actual injury to his own Plan account" that was "causally related to the conduct he seeks to challenge on behalf of the Plan." *Id.* at 593. The Court further explained that "if, as the record develops, it were to become apparent that there were breaches of duty entirely unrelated to [the plaintiff's] injury, it could be appropriate to inquire into his standing to raise those separate claims." *Id.* at 603 n.4. *Braden* thus confirms that, to satisfy Article III, a plaintiff must allege that any claimed breach personally caused him injury. Under *Braden*, Rico lacks standing to challenge the Mid-Cap Fund's inclusion in the Plan because he was not personally harmed by that inclusion.

Rico's conclusory allegation that a "singular conduct" underlies his claims with respect to both the Mid-Cap Fund and the Growth Stock Fund (Compl. ¶ 32) does not change the standing analysis. Rico has not alleged any facts to support his "common course of conduct" allegation, and conclusory assertions are disregarded at the pleading

---

[7] *See Schave v. CentraCare Health Sys.*, 2023 WL 1071606, at *2-3 (D. Minn. Jan. 27, 2023) (Wright, J.).

18

stage. *See Iqbal*, 556 U.S. at 678. In all events, this case is nothing like *Braden*, where the plaintiff alleged systemic, plan-wide mismanagement that affected all plan participants. 588 F.3d at 590-91. Here, Rico's theory is that Defendants acted imprudently when making two distinct and independent decisions: (*i*) the decision to retain the Mid-Cap Fund, and (*ii*) the decision to retain the Growth Stock Fund. Since the former decision had no impact on Rico, he lacks standing to challenge that decision.

## II.     RICO FAILS TO PLAUSIBLY ALLEGE THAT IT WAS IMPRUDENT TO CONTINUE OFFERING THE CHALLENGED FUNDS.

On the merits, Rico's claim that Defendants breached their duty of prudence by maintaining the Challenged Funds as Plan investment options fails for three reasons: (*i*) allegations of underperformance, standing alone, do not give rise to an inference of imprudence; (*ii*) Rico fails to plausibly allege that his comparator funds are meaningful benchmarks; and (*iii*) in any event, there is no evidence of persistent, material underperformance relative to those comparator funds.

### A.     Rico's Allegations that the Challenged Funds Underperformed Other Funds Are Insufficient to Survive a Motion to Dismiss.

An ERISA plaintiff claiming a breach of the duty of prudence has "a challenging pleading burden." *Meiners*, 898 F.3d at 822. A claim for imprudence is based on "'an objective standard' that focuses on 'the process by which' decisions are made, 'rather than the results of those decisions.'" *Davis*, 960 F.3d at 482 ("A prudently made decision is not actionable . . . even if it leads to a bad outcome."); *Divane v. Nw. Univ.*, 953 F.3d 980, 992 (7th Cir. 2020) ("[T]his court has determined 'the ultimate outcome of an investment is not proof of imprudence.'"); *PBGC*, 712 F.3d at 721 ("[A]n allegation that

19

an investment's price dropped, even precipitously, does not alone suffice to state a claim under ERISA."). If a plaintiff is unable to allege facts concerning flaws in the fiduciary's decision-making process, he can survive a motion to dismiss only by citing data about the outcome of an investment decision that is sufficiently egregious to infer "that 'a prudent fiduciary in like circumstances would have acted differently.'" *Meiners*, 898 F.3d at 822.

Because there are a "range of reasonable judgments a fiduciary may make," *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022), an investment decision is not imprudent merely because in hindsight a better-performing investment existed in the marketplace. *Meiners*, 898 F.3d at 822. Instead, a plaintiff "must provide a sound basis for comparison" and allege that the challenged investment systematically underperformed "a meaningful benchmark." *Davis*, 960 F.3d at 484.

The Complaint does not satisfy that pleading standard. Rico concedes that he has no knowledge of the Plan fiduciaries' decision-making process and therefore cannot allege facts concerning that process. (Compl. ¶ 23.) He therefore asks the Court to infer that the decision-making process was flawed based on allegations that the Challenged Funds underperformed certain other funds over specific timeframes. (*Id.* ¶¶ 20, 23, 173.)

But there is no basis to infer that a plan's fiduciaries acted imprudently merely because they did not "pick the best performing fund." *Meiners*, 898 F.3d at 823; *see Matousek*, 51 F.4th at 281-82 (dismissing imprudence claim because allegations that "returns are too low" do not suffice); *Davis*, 960 F.3d at 484-87 (same).[8] Instead, to raise

---

[8] *See also Forman v. TriHealth, Inc.*, 40 F.4th 443, 448-49 (6th Cir. 2022) ("[A] showing of imprudence cannot 'come down to simply pointing to a fund with better

an inference of imprudence, Rico's burden was to allege facts showing that the Challenged Funds consistently and materially underperformed meaningfully comparable alternatives. As discussed below, Rico's comparator funds are not meaningful benchmarks, and his allegations of underperformance are neither systemic nor material. He therefore has not alleged facts sufficient to support an inference that the Plan's fiduciaries acted imprudently by retaining the Challenged Funds.

### B.   Rico Fails to Offer Meaningful Comparators to the Challenged Funds.

Rico offers five comparators for each of the Challenged Funds. In each case, he identifies an unmanaged market index in which participants cannot invest; one passively-managed fund that tracks the index; and three actively-managed funds that he alleges employ the same investment style. *See* Background §§ A.1 & A.2, *supra*. None of his proposed comparators constitutes a meaningful benchmark.

### 1.   *Market Indexes and Passively-Managed Index Funds Are Not Meaningful Comparators.*

As an initial matter, the Challenged Funds cannot be compared to unmanaged market indexes or passively-managed index funds as a matter of law because they have "different aims, different risks, and different potential rewards" as compared to actively-managed funds. *Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1306 (D. Minn.

---

performance.'"); *PBGC*, 712 F.3d at 718 ("Nor is it necessarily sufficient to show that better investment opportunities were available at the time of the relevant decisions."); *White v. Chevron Corp.*, 2016 WL 4502808, at *17 (N.D. Cal. Aug. 29, 2016) ("Poor performance, standing alone, is not sufficient to create a reasonable inference that plan administrators failed to conduct an adequate investigation . . . ."), *aff'd*, 752 F. App'x 453 (9th Cir. 2018).

2021) (Doty, J.); *see Davis*, 960 F.3d at 485, 487 n.4 (holding that market index does not offer a meaningful comparison to actively-managed fund because "it is not a fund, much less an actively managed one"). As one court explained, actively-managed funds are not comparable to passively-managed funds because the former can offer the "chance to earn superior returns, access specialized sectors, or take advantage of alternative investment strategies" while also "allowing rapid turnover." *Davis v. Salesforce.com, Inc.*, 2020 WL 5893405, at *3 (N.D. Cal. Oct. 5, 2020) (cleaned up).

### 2. The Actively-Managed Comparators Are Not "Meaningful Benchmarks."

As in *Meiners* and *Davis*, Rico's comparisons to the actively-managed funds fail because they bear no meaningful resemblance to the Challenged Funds in investment strategy, composition, allocation, or risk.

In *Meiners*, participants alleged that plan fiduciaries acted imprudently by retaining a suite of target-date funds ("TDFs") that underperformed a suite of TDFs managed by another provider. 898 F.3d at 821. The Eighth Circuit held that the two suites of TDFs were not comparable because they employed different investment strategies insofar as they had different bond and equity allocations and different glide paths. *Id.* at 823, 825 n.2. The court rejected the contention that the two TDF suites were comparable because they shared the same generic "TDF" label, holding that "more than 'labels and conclusions'" are needed to plausibly state a claim. *Id.* at 821. The Court made clear that a plaintiff fails to raise an inference of imprudence if he does not demonstrate that two funds pursue the same investment objectives through comparable means. *Id.*

22

Similarly, in *Davis*, the Eighth Circuit rejected a claim of imprudence because two funds employed different investment strategies. Specifically, the challenged fund invested 30% of its assets in international securities and thus allowed investors to gain "broad exposure to both domestic and international equities," while the proposed alternatives had a considerably smaller exposure to the international market. *Id.* at 485. The upshot of *Davis* is that a comparator fund provides a meaningful benchmark only if it employs the same investment strategy as the challenged fund. *See id.*

Rico's proposed actively-managed comparators fail under *Meiners* and *Davis* because they pursue different investment strategies; invest in different industries and companies in different amounts; pursue different approaches to risk and diversification; and may not be suitable for a plan of RBC's size. Instead, Rico's allegations assume that all "mid cap growth" funds and all "large cap growth" funds are interchangeable with one another. (*E.g.*, Compl. ¶¶ 77, 128.) That notion has been repeatedly rejected. *See Meiners*, 898 F.3d at 823, 825 n.2; *Matousek*, 51 F.4th at 281; *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015, 1023 (9th Cir. 2025); *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1154 (10th Cir. 2023).

### a. The Mid-Cap Fund

Rico's actively-managed comparator funds are not meaningful benchmarks for the Mid-Cap Fund. The Mid-Cap Fund focuses its investments in the healthcare and information technology sectors, while Rico's comparators focus on the aerospace, defense, automotive, consumer discretionary, and industrials sectors. *See* Background § A.1, *supra*. The Mid-Cap Fund also follows a fundamentally-driven investment

23

approach that combines quantitative and qualitative analysis; by contrast, the Janus Henderson Fund follows a bespoke low-risk strategy; the Baron Fund aims for concentrated, long-term investments; and the Federated Fund follows a purely quantitative approach. *Id.*

Because they follow different strategies, the portfolios of these funds are quite different. The Mid-Cap Fund is far more diversified: its top-ten holdings account for only 18.6% of assets, and it holds 131 companies. Meanwhile, the proposed comparators hold far fewer companies' stocks, and their top-ten holdings account for between 26.5% and 60% of their total assets. *See id.* There is also little overlap in the respective funds' holdings: the Mid-Cap Fund shares no top-ten holdings with the Baron or Janus Henderson Funds and only one with the Federated Fund. (*Id.*) And the Complaint alleges no overlap among the hundreds of other holdings in the funds' portfolios. Without these allegations, Rico's proposed comparators are not adequate to state a claim. *See Matousek*, 51 F.4th at 281 (holding comparison of challenged investments to "peer group" insufficient without allegations about how peer group was composed, whether they hold similar securities, have similar investment strategies, and reflect a similar risk profile).

The Mid-Cap Fund is also significantly larger than Rico's comparator funds: it has $25 billion in assets, which is significantly larger than the Baron ($3.42 billion), Federated ($5.6 billion), and Janus Henderson Funds ($1.84 billion). It could be risky for the Plan to invest large amounts in a smaller fund, and a prudent fiduciary would rightly consider that risk when weighing whether to replace an existing plan investment. *See Smith*, 37 F.4th at 1168 (imprudence claim "d[id] not measure up" where challenged

24

funds had more than twice the amount of assets as alleged comparator funds); *Bracalente v. Cisco Sys., Inc.*, 2025 WL 770350, at \*5 (N.D. Cal. Mar. 11, 2025) (holding Blackrock TDFs were not comparable to alternative TDFs that had one-half the assets because plan could not responsibly invest in a fund where its assets would make up too large a portion of the fund); *Batt*, 2026 WL 674322, at \*6 (observing that fund size "is a fair starting point" in making a meaningful comparison).

Nor can Rico establish that the Mid-Cap Fund and his actively-managed comparators present similar risks. Rico's allegation that each fund has "a very aggressive risk profile" (Compl. ¶¶ 125, 135, 144, 152) is conclusory and provides no insight into whether any of the funds offer a "sound basis for comparison." *Batt*, 2026 WL 674322, at \*1 (holding participants did not plausibly allege that funds shared same "risk-ratio" where they did not quantify it or compare the funds' asset allocations (citing *Matousek*, 51 F.4th at 278)).

### b.     The Growth Stock Fund

For the same reasons, Rico does not allege facts showing that his proposed comparator funds employ the same investment strategy as the Growth Stock Fund. For example, the Alger Fund employs a bespoke, proprietary investment approach developed by its founder decades ago. *See* Background § A.2, *supra*. A prudent fiduciary could easily conclude that it would be more reasonable to select a fund that employs the more traditional, fundamentally-driven approach employed by the Growth Stock Fund. The Federated Large Cap and Fidelity Funds likewise employ different, quantitatively-driven

25

investment strategies and concentrate their investments in different sectors than the Growth Stock Fund. *Id.*

Because the comparator funds employ different investment strategies, their investment portfolios differ significantly from the Growth Stock Fund. For instance, the Growth Stock Fund holds 99 securities, compared to 375 for the Fidelity Fund and 50 for the Alger Fund, thereby reflecting fundamentally different levels of concentration, diversification, and risk. *See id.*; *Matousek*, 51 F.4th at 281 (rejecting comparison of funds that invested in different number of securities (citing *Davis*, 960 F.3d at 486)); *Parmer*, 518 F. Supp. 3d at 1306-07 (ruling that TDFs were not comparable where they held varying numbers of underlying investments and different concentrations of bonds).

The funds also target different types of companies. The Growth Stock Fund invests in established growth companies, while the Federated Large Cap Fund is limited to large-cap domestic companies, the Fidelity Fund invests only in "blue chips," and the Alger Fund is agnostic as to company size. *See* Background § A.2, *supra*. That the Growth Stock Fund shares three holdings with Rico's alleged comparators proves nothing; the funds have hundreds of other investments and there are no allegations about any overlap among them.

Rico's allegation that the comparator funds have the same risk profile as the Growth Stock Fund (Compl. ¶¶ 74, 83, 93, 103) is conclusory. Nor does Rico explain why a prudent fiduciary would replace the $50 billion Growth Stock Fund with the Alger or Federated Large Cap Funds, each less than one-eleventh its size. *See* Argument § II.B.2.a, *supra*.

26

C.   **Rico Has Not Alleged that the Challenged Funds Systematically and Materially Underperformed His Proposed Comparators.**

Even if Rico's funds were meaningful comparators, he still has not established that the Challenged Funds systematically underperformed them. Instead, Rico selectively frames the data to obscure the Challenged Funds' actual track records.

For the five years preceding the January 1, 2021 start of the putative class period, Rico offers only a single data point on the relative performance of the Challenged Funds: He alleges that the five-year *cumulative* returns of the Challenged Funds lagged their proposed comparators. (Compl. at Tables 1.a, 2.a.) But a single snapshot in time is not a sufficient basis on which to infer imprudence for investments held over the long term. *Davis*, 960 F.3d at 487 n.5; *see, e.g.*, *Matousek*, 51 F.4th at 281 (raw one-, three-, five-, and ten-year performance numbers do not supply a meaningful basis to infer imprudence); *Smith*, 37 F.4th at 1166 ("Merely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision . . . ."); *Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP Fund*, 513 F. App'x 78, 80-81 (2d Cir. 2013) (same); *Schave v. CentraCare Health Sys.*, 2023 WL 1071606, at *6 (D. Minn. Jan. 27, 2023) (Wright, J.) ("raw-performance" comparison over five-year period insufficient); *Williams v. Centene Corp.*, 2023 WL 2755544, at *5 (E.D. Mo. Mar. 31, 2023) (three- and five-year underperformance insufficient). Indeed, Rico's myopic focus on a single data point—cumulative returns for the five-year period spanning 2016 to 2021—obscures any meaningful comparison. *See Forman v. TriHealth, Inc.*, 563 F. Supp. 3d 753, 765

27

(S.D. Ohio 2021) ("[B]ecause the Court cannot review the yearly figures, which is how the data would presumably be presented to and considered by Defendants, it cannot infer that Defendants' process is flawed from the perspective of the 'prudent man' standard."), *aff'd on other grounds*, 40 F.4th 443 (6th Cir. 2022).

Rico does not allege that the Challenged Funds consistently or materially lagged their comparators during the years leading up to the putative class period. Nor could he; when assessing the annual performance of the Challenged Funds, there is no discernible trend of persistent, material underperformance. To the contrary, the Challenged Funds in several years outperformed the alleged comparators and in other years were in the middle-of-the-pack. *See* Background § A.1, A.2, *supra*.[9]

And they performed *better* than their comparators during significant portions of the alleged class period. Specifically, the Mid-Cap Fund outperformed two of Rico's five comparators in the first year of the putative class period, four of five in the second year, and all five this year. (Compl. at Table 2.b.) The upshot is that, for much of the putative class period, Plan participants were better off investing in the Mid-Cap Fund than they would have been investing in Rico's alleged comparators. The claim that a prudent fiduciary would have replaced the Mid-Cap Fund with an alternative that did not perform as well going forward is nonsensical.

---

[9] The Challenged Funds in fact delivered strong annual returns during the years leading up to the putative class period, with the Mid-Cap Fund returning over 16% per year and the Growth Stock Fund returning over 19% per year. (Compl. at Tables 1.a, 2.a.)

Meanwhile, the Growth Stock Fund outperformed all but one comparator by several percentage points in 2023, the third year of the putative class period. (Compl. at Table 1.b.) Even if the Growth Stock Fund underperformed the comparators in 2024 and 2025, that does not suggest that its inclusion in the Plan was imprudent. *See Smith*, 37 F.4th at 1166 ("Any other rule would mean that every actively-managed fund with below-average results over the most recent five-year period would create a plausible ERISA violation."); *Cervantes v. Invesco Holding Co. (US), Inc.*, 2019 WL 5067202, at *6 (N.D. Ga. Sept. 25, 2019) (granting motion to dismiss where annual performance of targeted funds was mixed over six-year period). It is simply not the case that the Growth Stock Fund persistently underperformed Rico's comparators. Rico can show underperformance only by cherry-picking specific timeframes.

The allegation that the Challenged Funds underperformed their benchmark indexes over certain periods does not support an inference of imprudence, either. Funds often underperform their indexes. If that were sufficient to render a fund imprudent, there would be few funds from which plan administrators could choose. *See Smith v. CommonSpirit Health*, 2021 WL 4097052, at *8 (E.D. Ky. Sept. 8, 2021) (holding that participant failed to state an imprudence claim even though investment underperformed its benchmark index by 1.58% over five-year period), *aff'd*, 37 F.4th 1160; *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *10 (S.D.N.Y. Oct. 7, 2019) (holding that allegation that plan investment underperformed its benchmark index over one-, five-, and ten-year periods was based on hindsight and was not sufficiently persistent or substantial to support imprudence claim); *Dawson v. Brookfield Asset Mgmt. LLC*, 2026 WL 835553,

29

at *15-16 (N.D. Ohio Mar. 26, 2026) (holding TDFs' underperformance against its benchmark of 1% to 2.80% per year is too "modest" to infer imprudence). In fact, four of Rico's six actively-managed comparators also underperformed their benchmark indexes prior to or during the putative class period. (Compl. at Tables 1.a-b, 2.a-b.) No prudent fiduciary would decide to remove a fund for allegedly underperforming its benchmark and replace it with another fund that also underperformed its benchmark.

Rico's allegation that the Challenged Funds experienced "outflow[s]" also does not raise an inference of imprudence. (Compl. ¶¶ 11-19.) The Challenged Funds are significantly larger than five of the six actively-managed funds identified in the Complaint, so even if they experienced outflows, they still attracted multiples more investment than the comparators. *See Smith*, 37 F.4th at 1167-68 (ruling that outflows from challenged investments did not support imprudence claim because they still had more than twice the assets of the alleged comparators); *Patterson*, 2019 WL 4934834, at *11 (rejecting allegation that challenged fund experienced "mass redemptions" as insufficient "without more context as to the nature or circumstances surrounding those redemptions"). Moreover, Rico fails to allege whether any of the proposed comparator funds also experienced outflows during the same period. Without that comparison, his allegation that the Challenged Funds experienced outflows is meaningless.

\*     \*     \*

At bottom, Rico's proposed comparator funds do not provide meaningful benchmarks for the Mid-Cap Fund or the Growth Stock Fund. A prudent fiduciary could consider the differences in the respective funds and easily conclude that the Challenged

30

Funds were more suitable investment options for Plan participants. Indeed, the market considers the Challenged Funds to be prudent investments: Other investors have invested tens of billions of dollars in each of the Challenged Funds—orders of magnitude more than has been invested in all but one of Rico's proposed comparators. The mere fact that the Challenged Funds underperformed differently-situated funds during certain time periods but not others does not support an inference that the Plan's decision-making process was flawed.

## III. RICO'S CO-FIDUCIARY AND DUTY-TO-MONITOR CLAIMS SHOULD BE DISMISSED.

Absent a viable predicate claim for breach of fiduciary duty, Rico's derivative claims for co-fiduciary liability and failure to monitor likewise fail. *See Allen v. Wells Fargo & Co.*, 967 F.3d 767, 777 (8th Cir. 2020) (affirming dismissal of "derivative claims of co-fiduciary liability and breach of the duty to monitor" where fiduciary-breach claims also dismissed). For the reasons stated above, Rico has failed to state a claim that Defendants breached their duty of prudence. Rico's derivative claims for breach of co-fiduciary duty and failure to monitor therefore also fail.

Rico's claims for co-fiduciary breach and breach of the duty to monitor fail for additional reasons, too. To plead a breach of co-fiduciary duty under ERISA, a plaintiff must allege facts showing that: (*i*) a fiduciary had actual knowledge of another fiduciary's breach and either knowingly participated in that breach, tried to conceal it, or failed to take reasonable efforts to remedy it; or (*ii*) one fiduciary's breach enabled another to commit a breach. *See* ERISA § 405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3);

31

*Maniace v. Com. Bank of Kan. City, N.A.*, 40 F.3d 264, 268 (8th Cir. 1994). The Complaint alleges neither. Instead, it merely parrots the language of section 405(a)(1)-(3) and asserts in conclusory fashion that Defendants are liable for a co-fiduciary breach. (Compl. ¶ 217.) That "formulaic recitation of the elements" does not state a claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see York v. Wellmark, Inc.*, 2017 WL 11261026, at *14 (S.D. Iowa Sept. 6, 2017), *aff'd on other grounds*, 965 F.3d 633 (8th Cir. 2020).

Rico's failure-to-monitor claim fails for similar reasons. To plead a viable monitoring claim, Rico must allege that Defendants were responsible for appointing a fiduciary that committed a breach and had the authority to remove the breaching fiduciary. *See Crocker v. KV Pharm. Co.*, 782 F. Supp. 2d 760, 787 (E.D. Mo. 2010). Here, Rico's claim that Defendants had the authority to appoint, monitor, or remove a breaching fiduciary is belied by the plain terms of the Plan. (*See* Jeske Decl. Ex. B § 15.2) (stating that the Committee members are appointed by the Chair of the Committee). The failure-to-monitor claim should thus be dismissed.

## IV.   RICO FAILS TO PLAUSIBLY ALLEGE THAT RBC AND THE BOARD ARE FIDUCIARIES WITH CONTROL OVER PLAN INVESTMENTS.

Rico's claims against RBC and the Board should be dismissed for the additional reason that Rico fails to plausibly allege that they are fiduciaries with authority to select and monitor the Plan's investments. ERISA § 3(21)(A) provides that a person is a fiduciary only "to the extent" that he or she exercises a fiduciary function, such as exercising "discretionary authority or discretionary control respecting management of [a]

plan." 29 U.S.C. § 1002(21)(A). Thus, "[i]n every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether [the defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdich*, 530 U.S. 211, 226 (2000).

Here, Rico alleges no facts to support his claims for breach of fiduciary duty, breach of co-fiduciary duty, or breach of the duty to monitor against RBC and the Board. The Plan document clearly provides that the responsibility for monitoring Plan investments lies exclusively with the Committee. (Jeske Decl. Ex. B § 15.2). Accordingly, RBC and the Board should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion to Dismiss and dismiss the Complaint in its entirety without leave to replead.

Dated: May 29, 2026                    Respectfully submitted,


**PROSKAUER ROSE LLP**

By: */s/ Russell L. Hirschhorn*
Russell L. Hirschhorn (NY #4020335)
(admitted *pro hac vice*)
Neil V. Shah (NY #4822029)
(admitted *pro hac vice*)
Sydney L. Juliano (NY #5865985)
(admitted *pro hac vice*)
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3286
rhirschhorn@proskauer.com
nshah@proskauer.com
sjuliano@proskauer.com

**DORSEY & WHITNEY LLP**
Kirsten E. Schubert (#0388396)
Anna M. Ashley (#0506606)
50 South 6th Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 340-2600
schubert.kirsten@dorsey.com
ashley.anna@dorsey.com

*Counsel for Defendants*


34